# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs April 30, 2015

## IN RE KAYDEN H.

**Appeal from the Circuit Court for Blount County**
**No. E-25400      Tammy M. Harrington, Judge**

---

**No. E2014-02360-COA-R3-PT – Filed June 23, 2015**

---

This is a termination of parental rights case, focusing on Kayden H., the minor child ("the Child") of Kristy L. ("Mother") and Johnathan H. ("Father"). On January 28, 2014, the Child's paternal grandparents, Linda H. and Donald H. ("Grandparents"), filed a petition to terminate the parental rights of the parents and adopt the Child. Father joined as a co-petitioner in order to consent to the termination of his parental rights. Father is not a party to this appeal. Following a bench trial, the trial court found that grounds existed to terminate the parental rights of Mother upon its finding by clear and convincing evidence that Mother had abandoned the Child by willfully failing to provide support and willfully failing to visit the Child in the four months preceding Mother's September 2013 incarceration. The court also found by clear and convincing evidence that Mother had abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to Mother's incarceration. The court further found by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Mother has appealed. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Gina M. Jenkins, Maryville, Tennessee, for the appellant, Kristy L.

Lance A. Evans, Maryville, Tennessee, for the appellees, Linda H. and Donald H.

**OPINION**

## I. Factual and Procedural Background

Mother and Father were never married. The Child, a daughter, was born to them in April 2006. According to Mother's testimony at trial, Mother, Father, and the Child resided together in a home owned by Father's grandmother, the Child's paternal great-grandmother, until early 2011. During the years that the parents resided together, Grandparents paid expenses related to the home. At some point prior to March 2011, Mother and Father separated. Mother and the Child then resided with the maternal grandmother.

In March 2011, the Department of Children's Services ("DCS") removed the Child from Mother's home and obtained a protective custody order from the Blount County Juvenile Court. As Mother acknowledged at trial, DCS removed the Child due to Mother's substance abuse. DCS placed the Child with Grandparents, with whom she resided continuously from March 2011 through trial in the instant action. During dependency and neglect proceedings in the Juvenile Court, Mother and Father respectively waived their rights to an adjudicatory hearing. Mother and Father stipulated to allegations contained in the dependency and neglect petition previously filed by DCS, specifically that the parents had both abused controlled substances and that Father had abandoned the Child. In an order entered October 17, 2011, the Juvenile Court adjudicated the Child dependent and neglected as to both Mother and Father.[1] The Juvenile Court placed legal and physical custody of the Child with Grandparents and ordered that each parent be permitted at least two hours per week of supervised visitation and two fifteen-minute telephone calls per week with the Child. DCS relinquished temporary custody of the Child, and the Juvenile Court closed the dependency and neglect proceedings with entry of the adjudicatory order.

On January 28, 2014, Grandparents filed a petition to terminate Mother's parental rights and adopt the Child. Father joined in the action as a co-petitioner in order to consent to the termination of his parental rights. As relevant to Mother's appeal, Grandparents alleged grounds of abandonment through willful failure to visit, willful failure to support, and Mother's conduct prior to her incarceration exhibiting wanton disregard for the Child's welfare. *See* Tenn. Code Ann. §§ 36-1-113(g)(1) (2014); 36-1-102(1)(A) (2014).

---

[1]At trial, Grandparents presented the Juvenile Court's adjudicatory order as an exhibit, which the trial court admitted without objection. The record before us does not contain the corresponding dependency and neglect petition. We therefore glean the allegations to which the parents stipulated from a summary description contained within the order.

2

Since the Child's birth in 2006 and subsequently as the Child was in Grandparents' care, Mother had faced several criminal charges and periods of incarceration or probation. According to Mother's testimony and certified copies of criminal warrants and judgments presented by Grandparents and admitted into evidence by the trial court, the following is a delineated timeline of Mother's relevant criminal history, incidents, and incarceration:

- July 17, 2008: Mother pled guilty in Blount County General Sessions Court to a traffic violation and a charge of driving with a license that had been revoked due to a previous conviction of driving under the influence of a controlled substance. Mother was sentenced to two days of time served in incarceration, six months of supervised probation, and a $50 fine.

- August 23, 2011: Mother pled guilty in Blount County General Sessions Court to charges of driving under the influence of a controlled substance and violation of the implied consent law. According to the arresting officer's affidavit, he had found Mother intoxicated and in a parked car with the engine running. Mother pled guilty and was sentenced to supervised probation.

- October 9, 2011, through November 25, 2011: Mother was incarcerated in the Sevier County Jail. Mother pled guilty in the Sevier County General Sessions Court on November 18, 2011, to violation of probation. According to the warrant issued against her and her testimony at trial in the instant action, she incurred new criminal charges in October 2011 of manufacturing methamphetamine, possession of a Schedule II controlled substance, and possession of a Schedule IV controlled substance. The criminal court found Mother in violation of probation, reinstated her probation for eleven months and twenty-nine days, and ordered her to participate in a residential treatment program.

- October 2, 2012, through December 12, 2012: Mother was incarcerated in the Sevier County Jail. Mother was convicted on November 26, 2012, on the above-listed charges incurred in October 2011, including one count of manufacturing methamphetamine, one count of possession of a Schedule IV controlled substance, and two counts of possession of a Schedule II controlled substance. Mother incurred an effective sentence of three years of incarceration as a range one offender at thirty percent, with the balance to be served on supervised probation, and $3,500 in fines.

- Mother was incarcerated from September 22, 2013, through December 17, 2013, in the Sevier County Jail. Mother was convicted on December 10, 2013,

3

of violation of probation. In the resultant order, the criminal court directed that Mother "do long term inpatient treatment" and be "transported to Center of Hope by Sevier County Sheriff's Dept."

- December 17, 2013, through trial on October 27-28, 2014: Mother participated in court-ordered residential treatment at the Center of Hope, with a projected graduation date of December 17, 2014.

In their petition to terminate Mother's parental rights, Grandparents stated that Mother was residing at the Center of Hope ("the Center") at the time of the petition's filing. At trial, the Center's former program director, Barbara Ellison, and current program director, Tanna Leatherman, testified on behalf of Mother. Ms. Ellison explained that the Center is a "12- to 18-month faith-based recovery program for women." According to Ms. Ellison, Center residents complete a twenty-eight day orientation and four consecutive phases within the program. During orientation, residents are not allowed off the Center campus, may not visit the Center's store, and are not allowed to use the phone. Residents then progress through the following four phases: (1) a six-week phase during which residents are not allowed off the Center campus but are allowed to use a telephone for ten minutes five nights a week; (2) a fourteen-week phase in which residents begin mandatory employment in the Center's thrift store and are allowed one forty-eight hour pass to leave campus once a month; (3) a third phase in which residents continue their work at the store and are allowed to leave on Sundays for two and one-half hours after church; and (4) the final phase in which residents continue their work at the store and are allowed to leave in the evenings and request a pass to leave each weekend. Ms. Elliott explained that each time a resident leaves the Center campus, she must submit to a drug screen upon her return. In addition, Ms. Leatherman testified that the Center has a "zero-tolerance policy" for substance abuse, meaning that if a resident fails a drug screen, she is required to leave the program. Ms. Ellison stated that residents participate in approximately fifty hours of "biblical teaching" each week. Ms. Leatherman acknowledged that although residents participate in "Celebrate Recovery" meetings, the Center does not engage licensed substance abuse counselors or refer residents to licensed counselors.

Mother testified that by the time of trial, she had participated in the Center's program for ten and one-half months. She stated that she was in the fourth phase of the program and had experienced success there in remaining drug-free. Ms. Ellison and Ms. Leatherman both testified that Mother had never violated the rules of the Center and that she had been one of the better employees in the Center's thrift store during her work there. Ms. Ellison acknowledged that had Mother violated the rules of the Center, Mother would have been returned to incarceration.

Following the filing of the termination petition in January 2014, Grandparents filed a motion for default judgment on May 13, 2014, averring that Mother was served with a summons and complaint on March 19, 2014, and had failed to plead or otherwise defend against the action. Upon Grandparents' request, the trial court entered an order on May 13, 2014, appointing attorney C. John Chavis as guardian *ad litem* ("GAL") to represent the Child. Upon Mother's filing an affidavit of indigency, the court subsequently entered an order on June 10, 2014, finding Mother to be indigent and appointing counsel to represent her.

Mother testified at trial that she had written a letter to Grandparents and mailed it in late March or early April 2014. Mother stated that her purpose in writing the letter was to reestablish visitation with the Child. Ms. Elliott corroborated this testimony and stated that she had urged Mother to write a letter to Grandparents explaining Mother's situation and that she had mailed the letter herself. Ms. Elliott, however, was unsure of the date the letter was mailed. Grandparents, each testifying individually, stated that they had not received the letter. Regarding the timing of Mother's attempt to reestablish visitation, the trial court expressly found in remarks made at the close of trial that Mother's credibility regarding the timing of the letter was questionable. The court specifically found that Mother did not request visitation until after she was served with the termination petition.

On June 13, 2014, Grandparents and Father filed an amended petition, amending their previous allegation as to Mother's abandonment through willful failure to visit and support to specify the determinative period of four months prior to Mother's incarceration on September 22, 2013. *See* Tenn. Code Ann. 36-1-102(1)(A)(iv). Mother subsequently filed an answer to the amended petition on August 8, 2014. It is undisputed that Mother did begin regularly exercising visitation with the Child in August 2014 when she was in the fourth phase of the Center's program.

Following a trial conducted over the course of two days on October 27 and 28, 2014, the trial court found by clear and convincing evidence that Mother had abandoned the Child by willfully failing to visit her, willfully failing to support or make reasonable payments toward support, and by exhibiting wanton disregard for the Child's welfare prior to incarceration. The court further found by clear and convincing evidence that it was in the best interest of the Child for Mother's parental rights to be terminated. Having noted in its order that Father had not appeared at trial and had previously signed a consent to the termination of his parental rights and adoption of the Child by Grandparents, the court also terminated Father's parental rights to the Child.

The trial court entered the final judgment memorializing its findings on November 25, 2014. One day prior to this entry, Mother filed a premature notice of appeal.

Following the entry of the final judgment, this Court treated Mother's appeal as timely pursuant to Tennessee Rule of Appellate Procedure 4(d).

## II. Issues Presented

Mother presents four issues on appeal, which we have restated slightly as follows:

1.      Whether the trial court erred by finding that there was clear and convincing evidence of the statutory ground of abandonment by willful failure to visit the Child.

2.      Whether the trial court erred by finding that there was clear and convincing evidence of the statutory ground of abandonment by willful failure to support the Child.

3.      Whether the trial court erred by finding that there was clear and convincing evidence of the statutory ground of abandonment based on wanton disregard for the welfare of the Child prior to Mother's incarceration.

4.      Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96,

97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Statutory Abandonment

Tennessee Code Annotated § 36-1-113 (2014) lists the statutory grounds for termination of parental rights, providing as follows:

(a)   The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)   Termination of parental or guardianship rights must be based upon:

(1)   A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

7

> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court terminated Mother's parental rights on the ground that she abandoned the Child. Tennessee Code Annotated § 36-1-113(g)(1) (2014) provides in relevant part:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

In the case at bar, the trial court found that Mother had abandoned the Child through willfully failing to visit or support her during the four months immediately preceding Mother's incarceration on September 22, 2013. In addition, the court found that Mother had abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to Mother's incarceration. The definition of abandonment applicable to these findings is contained in Tennessee Code Annotated § 36-1-102(1)(A)(iv) (2014), which provides:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . .

Pursuant to this definition, the statutorily determinative period applicable to consideration of Mother's alleged failure to visit and support the Child began four months immediately preceding her September 22, 2013 incarceration. This determinative period therefore spanned May 22, 2013, through September 21, 2013. *See In re D.H.B.,* No. E2014-00063-COA-R3-PT, 2015 WL 1870303 at *8 (Tenn. Ct. App. Apr. 23, 2015)

(interpreting the four-month period "immediately preceding" the parent's incarceration as ending on the day before the actual date of incarceration).[2] We note that pursuant to the statutory definition, this determinative period would apply even under the assumption, *arguendo*, that Mother's incarceration ended on December 17, 2013, because she was nonetheless incarcerated for part of the four months immediately preceding the filing of the petition on January 28, 2014. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv); *State v. C.H.K.*, 154 S.W.3d 586, 591 (Tenn. Ct. App. 2004) (vacating the trial court's finding based upon the abandonment definition contained in Tenn. Code Ann. § 102(1)(A)(iv) when the court failed to find that the parent had been incarcerated on the date the petition was filed or "during all or <u>part of</u> the four months immediately preceding that date.") (emphasis added).

Pursuant to the statute, the court must also find that a parent's failure to visit or support during the determinative period was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d at 863.

Failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. Further, failure to visit or to support is not excused by another person's conduct "unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.*

This Court further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly,

---

[2]As we will address in a subsequent section of this opinion, the four-month determinative period is not applicable to the ground of abandonment through wanton disregard for the Child's welfare because consideration of this ground requires consideration of Mother's conduct throughout the Child's life prior to Mother's incarceration. *See In re Audrey S.*, 182 S.W.3d at 865.

triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

This Court has often held that a parent's "demeanor and credibility as a witness also play an important role in determining intent, and trial courts are accordingly in the best position to make such determinations." *In re Adoption of Destiny R.D.*, No. M2011-01153-COA-R3-PT, 2012 WL 1066496 at *7 (Tenn. Ct. App. Mar. 27, 2012) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)). Further, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." Incorporating the foregoing analysis, we shall review in turn each form of statutory abandonment found by the trial court.

### A. Willful Failure to Visit

In its judgment, the trial court specified the following pertinent findings of fact regarding the ground of abandonment by willful failure to visit the Child:

> [Mother], by her own testimony, wil[l]fully failed to visit with [the Child] from March, 2013 through September, 2013, prior to her incarceration from September 22, 2013 through December 17, 2013.
>
> * * *
>
> [Mother] initiated requests and did visit with [the Child] approximately 7 months after the Petition to terminate parental rights was filed in this cause.
>
> [Mother] had weekend passes from the Center of Hope ([Mother's] court ordered residential drug treatment facility) before August, 2014 and could have made requests to visit with [the Child] earlier than she did.

The trial court therefore found by clear and convincing evidence that Mother had willfully failed to visit the Child during the determinative four-month period immediately preceding Mother's incarceration prior to the filing of the termination petition. We agree with this conclusion.

10

Mother testified that following entry of the Juvenile Court's adjudicatory order in October 2011, she consistently exercised two hours of visitation with the Child on alternate weekends pursuant to such order. Within a few months, however, Mother began to miss visits with the Child. Although she described transportation problems and some disagreement with Grandparents over visitation locations, Mother acknowledged that the root cause of her failure to visit was that she "kind of fell into . . . a bad depression and [she] turned to drugs." Mother testified that she visited the Child in February 2012 when Grandmother brought the Child to the maternal great-grandmother's home for a visit approximately a month before the maternal great-grandmother died. Mother also testified that she visited the Child in March 2012 when Grandmother brought the Child for a visit with Mother at a fast-food restaurant.

When Mother originally testified to the February and March visits described above, she did not specify the year. Upon further questioning, she clarified that the year in which the visits took place was 2012, remembering that the Child's great-grandmother had died in March 2012. When subsequently questioned regarding whether she had visited the Child between her release from jail on December 12, 2012, and her incarceration on September 22, 2013, Mother answered, "No." The trial court in its final judgment found that Mother had not visited the Child between March 2013 and September 22, 2013. Upon our careful review of the record, we determine that whether Mother's last visit with the Child prior to Mother's incarceration was in March 2012 or March 2013, it is undisputed that Mother did not visit the Child during the four-month determinative period prior to her September 22, 2013 incarceration.

Mother contends that the trial court erred by finding that her failure to visit during the determinative period was willful because Mother did not have a driver's license or transportation. She asserts that Grandparents began in late 2011 to insist that visits take place at public locations in Maryville, where Grandparents resided, rather than at a Burger King restaurant on Chapman Highway in Seymour, close to where Mother resided. This assertion is unavailing. *See In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) ("A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child."). In addition, Mother acknowledged at trial that any attempts to visit the Child during the time period at issue were thwarted by her own state of mind and substance abuse.

As the trial court found, Mother did begin visiting the Child again after she had been served with the termination petition. According to Grandmother's and Mother's respective testimonies, Mother began to arrange visitation with the Child in August 2014 after Mother had reached the fourth and last phase of her rehabilitation program, during which she was allowed to exit the Center campus on evenings and weekends. Mother

11

thereafter regularly fulfilled the two hours of visitation per week allowed by the Juvenile Court's adjudicatory order, and the Center's staff often assisted with Mother's transportation to visits. As the trial court also noted, however, testimony demonstrated that Mother would have been able to request one forty-eight-hour pass per month once she reached the second phase of the program at approximately the end of February 2014. We conclude that the trial court did not err in terminating Mother's parental rights based upon this statutory ground.

## B. Willful Failure to Support

In its final judgment, the trial court included the following specific findings regarding Mother's willful failure to support the Child:

> The Blount County Juvenile Court advised [Mother] that she had a duty to pay child support for the benefit of [the Child] in the Adjudicatory Order entered on October 17, 2011, and Exhibit 1 at the trial of this cause.

> [Mother], by her own testimony, wil[l]fully failed to pay any child support for the benefit of [the Child] at any time while [Grandparents] had custody of [the Child], including the four months prior to [Mother's] incarceration from March, 2013 through September, 2013. The testimony that [Mother] did provide a few items of clothing for [the Child] was only token child support.

The court therefore found that Mother had willfully failed to support the Child during the determinative four-month period prior to Mother's incarceration on September 22, 2013. We agree.

It is undisputed that Mother paid no funds toward support of the Child during the three and one-half years the Child was in Grandparents' care prior to trial. In its October 2011 adjudicatory order, the Juvenile Court included the following statement regarding child support:

> Parents notified of duty to support; Custodians advised to seek support through court order at DHS, if order is required or desired.

Mother does not dispute that she was notified of the duty to pay support during the dependency and neglect proceedings, and she also does not dispute the trial court's finding that the few items of clothing she provided Grandparents for the Child constituted only token support. *See* Tenn. Code Ann. § 36-1-102 (1)(B) (defining "token support" to mean that "the support, under the circumstances of the individual case, is insignificant

12

given the parent's means").  Mother does assert that Grandparents never took affirmative steps to establish a court order.  Mother's assertion in this regard is unavailing because "the obligation to pay support exists even in the absence of a court order to do so." *State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004); *see also* Tenn. Code Ann. § 36-1-102(1)(H) (2010) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children.").

Mother's primary contention regarding this issue is that the trial court erred by finding that her failure to support the Child was willful because she did not have the ability to pay support during the determinative period.  We disagree.  During the determinative period prior to Mother's incarceration in September 2013, she was unemployed.  She testified that she had not completed high school and had not yet taken general education development ("GED") tests.  Mother stated that she had been employed prior to the Child's birth in 2006 as a dancer but that she had been unable to return to that employment.  Mother acknowledged that during the determinative period, she was addicted to controlled substances.  Mother presented no evidence indicating that she had any conditions other than her addiction problems that prevented her from working.  According to Mother and Center of Hope personnel, Mother had worked in the Center's thrift store six days a week since entering phase two of the program and had performed well in that capacity.  This testimony indicated that Mother was capable of employment when not hindered by substance abuse and criminal activity.  We conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that Mother abandoned the Child by willfully failing to support her during the determinative period prior to Mother's incarceration.

C. Wanton Disregard for the Child's Welfare Exhibited Prior to Incarceration

The trial court also terminated Mother's parental rights based on the ground of abandonment by engaging in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the child.  As noted above, Tennessee Code Annotated § 36-1-102(1)(A) defines abandonment in relevant part as:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, <u>or the parent or guardian has engaged in</u>

13

conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

(Emphasis added.) Regarding the ground of abandonment by wanton disregard, the statute does not limit the parent's conduct to any particular four-month period prior to incarceration. *See In re Audrey S.*, 182 S.W.3d at 865.

In the instant action, the trial court in its final judgment made the following pertinent findings:

> [Mother], by her own testimony, was illegally using drugs and engaging in criminal activity that caused her incarceration from September 22, 2013 through December 17, 2013, as well as prior times of incarceration in 2011 and 2012.
>
> * * *
>
> [Mother's] continued use of illegal drugs and criminal activity before and during the time that [Grandparents] had custody of [the Child] constitute wanton disregard for the welfare of [the Child].

The preponderance of the evidence adduced at trial supports these findings. During the nearly three-year period that the Child had been in Grandparents' custody prior to the filing of the termination petition, Mother incurred multiple criminal charges, most of which were related to abuse of controlled substances. Prior to her court-ordered transfer to a residential facility in December 2013, Mother repeatedly violated probation by incurring additional charges.

The above-referenced statute does not define "wanton disregard." We have previously explained the purpose behind this statutory section, however, as follows:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently

14

incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866 (internal citations omitted). As this Court further explained, "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 868; *see also In re D.M.*, M2009-00340-COA-R3-PT, 2009 WL 2461199 at *4 (Tenn. Ct. App. Aug. 12, 2009).

Upon our careful review of the record in this cause, we conclude that Mother engaged in conduct prior to her incarceration that exhibited a wanton disregard for the welfare of the Child. We recognize, as did the trial court, Mother's significant progress in her court-ordered rehabilitation program during the intervening months between the filing of the termination petition and trial. Mother presented periodic and random drug screen results from the Center, which demonstrated that Mother had remained drug-free during her ten and one-half months in the program. However, although Mother's progress in this court-ordered program was commendable, her previous failure to address her substance abuse issues and her ongoing criminal behavior and probation violations prior to her most recent incarceration demonstrated a broad pattern of conduct that had rendered her unfit to care for the Child.

Mother specifically argues that the trial court erred by finding clear and convincing evidence of this ground because the evidence was insufficient to show that she abused controlled substances when in the presence of the Child or that her behavior posed a risk of substantial harm to the Child. In support of her argument, Mother relies on this Court's decision in *In the Matter of Dylan M.J.*, No. M2010-01867-COA-R3-PT, 2011 WL 941404 (Tenn. Ct. App. Mar. 17, 2011). In *Dylan M.J.*, the father was incarcerated for an extended period of time after causing an accident with injuries to others while he was intoxicated. 2011 WL 941404 at *2. At the time of the accident, the child at issue, Dylan M.J., was visiting the father but was asleep at the home of the father's parents. *Id.* This Court considered the totality of the evidence, including the father's history of paying child support, showing "a great deal of care and concern" for the child, and exhibiting "genuine effort to establish a meaningful relationship" with the child, as well as the child's testimony regarding the father's efforts. *Id.* at *8. Based

upon all of the facts specific to the record in *Dylan M.J.*, this Court concluded that the evidence was insufficient to find that the father had exhibited wanton disregard for the child prior to incarceration. *Id.*

We determine the case at bar to be factually distinguishable from *Dylan M.J.* Mother, by her own testimony, began to take more pain medication than was prescribed to her soon after injuring her back in an automobile accident in December 2006 when the Child was only eight months old. During the dependency and neglect proceedings, Mother stipulated to her own substance abuse as a cause of the Child's neglect while in Mother's care. Mother also acknowledged falling into depression and substance abuse when the Child was removed from her home in March 2011. During the two and one-half years following the Child's removal prior to Mother's most recent incarceration, Mother incurred new criminal charges related to substance abuse and repeatedly violated probation. One of Mother's convictions during this time period was for manufacturing methamphetamine, a process known to place those exposed to it at risk. *See Dylan M.J.*, 2011 WL 941404 at *8 ("It is well known that the use of methamphetamine is not only dangerous to the health of the user, but also to the health of all those in whose presence it is used.") (distinguishing the factual circumstances existing in *Dylan M.J.* from those in *In re C.A.H. & K.M.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953 (Tenn. Ct. App. Dec. 23, 2009)).

Mother would have us conclude that because no witness testified as having observed her abusing controlled substances in front of the Child and no evidence was presented to show that she had manufactured methamphetamine in the presence of the Child, she did not exhibit wanton disregard for the Child's welfare. Mother misconstrues the second test for this statutory ground. Once a parent has been incarcerated, the second test is "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that <u>renders the parent unfit **or** poses a risk of substantial harm to the welfare of the child</u>." *See In re Audrey S.*, 182 S.W.3d at 866 (emphasis added); *see, e.g., In re Wesley S.*, No. E2012-02433-COA-R3-PT, 2013 WL 1412133 at *6 (Tenn. Ct. App. Apr. 9, 2013) (concluding that prior to his incarceration, the father exhibited wanton disregard for the child when he "knew he was responsible for the welfare of the Child" but "chose to embark upon a course of continuing criminal activity."). Under the circumstances of this case, it is not necessary for Grandparents to prove that the Child was in immediate risk of substantial harm due to Mother's substance abuse in order to prevail on this statutory ground. It is sufficient that Mother's conduct that resulted in her incarceration rendered her an unfit parent. *See In re Audrey S.*, 182 S.W.3d at 866. Upon a careful and thorough review of the record, we determine that the evidence does not preponderate against the trial court's finding, by a clear and convincing standard, that Mother's conduct prior to incarceration exhibited wanton disregard for the Child's

welfare. The trial court did not err in terminating Mother's parental rights based on this statutory ground as well.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of a statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2014) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.,* 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional

17

or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In analyzing the best interest factors, the trial court in its judgment terminating Mother's parental rights stated in pertinent part:

[Mother's] continued use of illegal drugs and criminal activity before and during the time that [Grandparents] had custody of [the Child] constitute wanton disregard for the welfare of [the Child].

The Blount County Juvenile Court made findings that [the Child] was a dependent and neglected child while in the care, custody and control of [Mother and Father] in the Adjudicatory Order entered on October 17, 2011.

It is in the best interest of [the Child] that the parental rights of [Mother] and [Father] be terminated. The Court finds that even though all parties loved [the Child], it [is] in [the Child's] best interest for the child going forward to remain with [Grandparents]; due to [the Child's] lack of a significant relationship with [Mother and Father] and the strong bond between [the Child] and [Grandparents]; due to the substantial periods of time that [the Child] did not have contact with her parents; due to the fact that [Grandparents] have provided and will continue to provide [the Child] with a safe and loving environment; and due to the fact that [the Child] has

18

been thriving in [Grandparents'] care as evidenced by being on the honor roll at school.

The trial court therefore concluded by clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights. We agree with the trial court.

In support of her argument that the trial court erred by finding that the best interest factors weighed against maintaining her parental rights, Mother asserts that the trial court failed to consider the factor of whether Mother had made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the Child's best interest to be in Mother's home. *See* Tenn. Code Ann. § 36-1-113(i)(1). Mother argues specifically that the trial court failed to consider the progress she had made toward rehabilitation while enrolled in a court-ordered residential treatment program, including her efforts made toward obtaining education and employment, as well as her consistently clean drug screens while in the program. Mother also argues that the court failed to consider the visitation she resumed with the Child in August 2014. We disagree. The trial court clarified its consideration of Mother's progress in the program at the Center in the following remarks made by the court at the close of trial:

> I agree with [GAL] Chavis that what [Mother] has accomplished in [the] last 13 months is significant, as far as – well, I guess since really December of being in this program at Center of Hope.

> I would be remiss if I didn't say that I have concerns over the lack of substantial alcohol and drug treatment as far as this program is concerned. There is no doubt that she has remained clean while there, that this is a healthy environment for her to live in, that she has flourished in this environment. But living in a controlled setting, and then living out without the controls, is a whole other thing.

> [Mother] presents as someone who has not been gainfully employed since this child was born. She does not have a GED, or a high school equivalent. She does not have housing. She plans on going back to the house which this child was removed from. She does not have transportation or a driver's license. And is still several weeks away from even being released from this program.

> This has been going on for, it will be four years in March of 2015. That is a significant time when this child has only been alive for eight, at this point.

19

After the child was removed, [Mother] continued up until she was finally arrested and court ordered to a program in September of 2013, to engage in the same type of conduct that led to the child's initial removal.

The trial court therefore commended Mother on the adjustment she had made in her conduct while in a controlled environment, but the court found that whether Mother would be able to continue her positive progress once she was no longer in a controlled environment involved speculation on which the Child's best interest could not be based. Mother testified, as did Center personnel, that she had participated in literacy classes but had not yet tested as ready to pass GED examinations. Mother also testified that after she exited the Center program, she would be residing with the maternal grandmother in the same home from which the Child previously had been removed. Mother further testified that when she left the program, she would be employed at a Burger King restaurant where her aunt worked. Her testimony thus demonstrated her plan to be employed, but, as the court noted, Mother was still weeks away from graduating in her program, and her employment plan was speculative. We conclude that in finding clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights, the trial court properly considered the factor of any adjustment made by Mother in her circumstance, conduct, or conditions. *See* Tenn. Code Ann. § 36-1-113(i)(1).

In addition to consideration of any adjustment made by Mother, the trial court's findings indicate that it weighed the following factors against preserving Mother's parental rights: (3) lack of visitation or conduct with the Child for substantial periods of time; (4) lack of a meaningful relationship with the Child; (5) negative effect a change of caretakers and physical environment is likely to have on the Child's emotional, psychological, and medical condition; (6) prior adjudication that the Child was dependent and neglected while in Mother's care; (7) history of criminal activity and use of controlled substances by Mother; (8) Mother's mental status in terms of her drug addiction that had prevented her from effectively providing safe and stable care and supervision; and (9) failure to pay child support. *See* Tenn. Code Ann. § 36-1-113(i).

The trial court also considered the GAL's recommendation that the best interest of the Child would be served by remaining in the care of Grandparents. It is undisputed that by the time of trial, the Child had flourished in Grandparents' care and had developed a meaningful bond with Grandparents. We conclude that the record sufficiently supports the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

20

## VI. Conclusion

The judgment of the trial court terminating the parental rights of Mother is affirmed. Costs on appeal are taxed to the appellant, Kristy L. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE